IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WELSH, | : | Case No. 1:12cv228 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART MOTION FOR |
| AUTOMATIC DATA PROCESSING, INC., | : | SUMMARY JUDGMENT |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

Plaintiff Christopher Welsh brought this action against his former employer Automatic

Data Processing, Inc. ("ADP")[1] and his former supervisor at ADP, Kevin Ryan.  Welsh alleges

that Defendants discriminated against him on the basis of his disability and retaliated against him

for engaging in protected activity in violation of the Americans with Disabilities Act ("ADA")

and Ohio law.  This matter is before the Court on Defendants' Motion for Summary Judgment

(Doc. 17).  For the following reasons, Defendants' Motion is GRANTED IN PART and

DENIED IN PART.

I.      BACKGROUND[2]

        A.      **Welsh's Employment and Termination**

_____

        [1]  Welsh named the following corporate entities as Defendants: Automatic Data
Processing, Inc.; ADP Atlantic, LLC; and ADP Inc.  These Defendants are collectively referred
to as "ADP."  ADP is a payroll processing company that offers products and services to assist
companies in managing payroll, benefits administration, and other human resources operations.

        [2]  Except as otherwise indicated, background facts are from Defendants' Proposed
Undisputed Facts (Doc. 17-1 at Page ID 401–08) to the extent they are admitted by Plaintiff in
Plaintiff's Response thereto (Doc. 20-11).

ADP hired Christopher Welsh in 1987.  From 1998 until April 2011, ADP employed Welsh as a district sales manager ("DSM") reporting to Kevin Ryan in ADP's National Account Services ("NAS") Division.  The NAS Division sells and provides ADP's services to companies that have more than 1,000 employees.  DSMs like Welsh are responsible for selling ADP's products and services to NAS customers and potential customers.  Ryan gives each DSM a sales quota that he or she is expected to reach on a monthly and yearly basis.

ADP's fiscal year ("FY") begins on July 1 and ends on June 30 of the following year. For example, FY 2007 ran from July 2006 through June 2007.  In FY 2007, Welsh missed his annual sales quota, selling 85% of his goal.  Welsh did better in FY 2008, selling 148% of his annual goal.  However, he met his monthly goal only three out of the twelve months that year. In FY 2009, Welsh's performance slumped: he earned only 63% of his goal.  The first half of FY 2010 was even worse.  From July through December 2009, Welsh's sales were -28% of quota, and he did not meet any of his monthly goals.[3]  In January 2010, Ryan had a discussion with Welsh regarding his sales performance.  During the discussion, Ryan told Welsh that if his performance did not improve, he would put Welsh on a "performance memo."  Ryan Dep. Ex. 1, Doc. 15-1 at Page ID 235.[4]

In March 2010, Welsh was diagnosed with multiple sclerosis ("MS").  Welsh told Ryan of his diagnosis.

---

[3]  Neither party discusses how a sales representative can end a month or fiscal year with a negative balance.  The Court presumes it results from "no starts" (deductions resulting from presumed sales that fall through) and draws against future commissions.

[4]  Also in January 2010, Ryan refused to recommend Welsh for a position within ADP's Comprehensive Outsourcing Services ("COS") unit.  Jim Devanna, the hiring manager for the COS position, interviewed Welsh but decided to hire someone with prior experience in COS.

On June 1, 2010, Ryan gave Welsh a performance memo that constituted a written warning regarding his sales performance.  In the memo, Ryan admonishes Welsh, "I need to require you to perform the job requirements of the DSM position."  Welsh Dep. Ex. 4, Doc. 14-1 at Page ID 145.  The written warning specifies that Welsh needs to show improvement in two areas: his level of work produced, and his activity and results.  Regarding the need for Welsh to improve his results, Ryan states in the memo:

> There is an expectation that each and every DSM achieve their sales goals.  As we have discussed many times over the past several months it is imperative that you become a contributing member of the Team.  Your sales results have been well under plan for the last 11 months this Fiscal Year [2010] and last year [FY 2009] you achieved plan 4 out of 12 months.  Also, last year you ended with $1150 on a plan of $1825 for a 63% YTD figure.  This year, as of the end of April, you have $(279)k of sales or (26)% YTD.  Once again, the expectations for a DSM are that they achieve 100% of their quota on a monthly basis and annual basis.

*Id*.[5]  The memo concludes, "there needs to be immediate improvement in the areas listed above. If immediate improvement is not seen, corrective action will result."  *Id*. at Page ID 146.  Welsh received and read the memo, and he testified at his deposition that he did not recall disagreeing with it.

In the six months following Welsh's receipt of the written warning, from June 2010 through November 2010, Welsh sold 61% of the cumulative quota and met his monthly quota one out of the six months.  Welsh Dep. Ex. 2, Doc. 14-1 at Page ID 129, 133.

On December 1, 2010, Ryan gave Welsh another performance memo.  In it, Ryan states that Welsh's performance continues to be below expectations.  Ryan reiterates, "[y]ou must reach your annual quota on a monthly basis in order to be successful."  Welsh Dep. Ex. 6, Doc.

---

[5]  Ryan used parentheses to indicate a negative number.

14-2 at Page ID 159.  Like the June performance memo, the December 2010 memo provides

details regarding Welsh's sales performance from FY 2009 to the present.  After noting that "the

expectations for a DSM are that they achieve 100% of their quota on a monthly and annual

basis," the memo sets forth the following information:

> • In FY09, you closed the year at 63% of plan with only 4 months
> that you performed over plan.
> • In FY10, you closed the year at -4% of plan with only 1 month
> over plan.
> • YTD in FY11, you are running at 73% of plan with November
> being your only month over plan so far.
> • Your sales results have been well under plan for the last 2.5
> years.

*Id*.  The memo concludes with a warning: "If immediate and consistent improvement is not

demonstrated, then further corrective action, *up to and including termination*, will occur."  *Id*.

(emphasis added).  Welsh received, read, and signed the memo.

That month, December 2010, Welsh achieved 137% of his monthly quota.  Welsh Dep.

Ex. 2, Doc. 14-1, at Page ID 133.  When Ryan notified Jean Coverick in ADP's human resources

department about Welsh's sales numbers (137% for the month and 83% of his year-to-date

quota), she responded, "sounds like we may be turning a corner with Chris [Welsh]."  Doc. 20-2

at Page ID 489.

Despite this uptick in Welsh's sales, sometime in January or early February 2011, Ryan

began to discuss whether to terminate Welsh's employment with ADP Senior Human Resources

Director Jill Banister.  Banister Dep. 66, Doc. 20-7 at Page ID 588.  Also around that time, Ryan

told Banister that Welsh had MS.  *Id*. at 77, Page ID 589.

On February 10, 2011, Ryan gave Welsh another memo regarding Welsh's sales

performance.  In it, Ryan states that he has seen little improvement in Welsh's performance since

4

giving him the warning on December 1.  Specifically, Ryan states that since June 2010, Welsh has met his monthly quotas only twice and that Ryan has not seen "enough activity to drive better results."  Welsh Dep. Ex. 9, Doc. 14-2 at Page ID 168.  Ryan reiterates in the memo that Welsh will be responsible for meeting his activity and quota objectives going forward and that "if immediate and consistent improvement is not demonstrated, then further corrective action, up to and including termination of your employment, will result."  *Id*.  Welsh received, read, and signed the February 2011 memo.

On April 5, 2011, Ryan terminated Welch's employment.  Welch had not meet his monthly quota in February or March 2011, selling just ten percent of his combined quota for those two months.  Welsh Dep. Ex. 2, Doc. 14-1 at Page ID 133.  ADP's stated reason for terminating Welch is unsatisfactory sales performance.

Welsh does not deny these facts.  While he objects to ADP's "characterization" of his performance, he does not dispute the numbers and admits that he was, "for the most part," below quota during the last two years of his employment and that Ryan brought this fact to his attention.[6]  Welsh Dep. 47–48, Doc. 14 at Page ID 80.

---

[6]  Throughout its motion for summary judgment, ADP refers to Welsh's sales statistics in time segments other than the fiscal year, which runs from July 1 through June 30 of each year. For example, ADP notes the following facts:
 • From April 2008 through December 2009, Welsh sold 20% of his quota.
 • From April 2008 through May 2010, Welsh sold 21% of his quota.
 • From July 2010 through November 2010, Welsh sold 73% of his quota.
 • From July 2010 through January 2011, Welsh sold 73% of his quota.
 • From July 2010 through March 2011, Welsh sold 60% of his quota.
Welsh states that this "mischaracterizes the evidence" because ADP evaluates its DSMs on fiscal year intervals.  Welsh states that by grouping sales data as it did, ADP is "cherry picking" portions of fiscal years for the purpose of suggesting that Welsh's performance was low.  He states that this manner of evaluating the sales data also ignores the fact that many other DSMs failed to meet their monthly and yearly quotas during the same time period.
Welsh is correct that ADP's performance goals and standings are established and

Welsh was not the only DSM reporting to Ryan who failed to meet monthly and annual quotas during the same time period.   Bob Capace, Jennifer Kirkwood, and Greg Duwe were non-disabled DSMs reporting to Ryan who, according to Welsh, were similarly situated to him but were not put on improvement plans or terminated.

Capace, like Welsh, failed to meet his sales quotas in FY 2009 and 2010, achieving only 32% and 56% of his sales goals for those two years and meeting his monthly sales quota in only 6 of the 24 months.  Capace showed improvement in FY 2011, selling 135% of quota at the time Welsh was terminated.  Kirkwood sold 200% of quota in FY 2007; 38% of quota in 2008; and 218% of quota in FY 2009.  She finished FY 2010 at -74% of her quota but showed improvement thereafter and had sold 189% of her FY 2011 quota at the time of Welsh's termination.  Duwe did not meet an annual quota until 2010, but he showed steady improvement after FY 2008 until mid-FY 2011 when he stopped working for Ryan.  The following chart summarizes these individuals' sales data:

---

reported per fiscal year.  However, Defendants' summaries of Welsh's sales and quota achievements listed above accurately calculate Welsh's total actual sales over the stated time period as a percentage of his total "plan" quota over the same time period.  Accurate summaries of Welsh's sales performance over time are appropriate for this Court's consideration.

| Fiscal Year | Welsh | Capace | Kirkwood | Duwe |
|---|---|---|---|---|
| 2007 | 85% | 86% | 200% | 87% |
| 2008 | 148% | 105% | 38% | 65% |
| 2009 | 63% | 32% | 218% | 92% |
| 2010 | -4% | 56% | -74% | 131% |
| 2011 (through March) | 60% | 135% | 189% | 32%[7] |

*See* Doc. 14-1 at Page ID 112, 117, 122, 129, 133.

Welsh was not the only DSM under Ryan to be terminated for poor sales performance during this time frame. Reggie Armstrong started working as a DSM reporting to Ryan on September 1, 2008. Armstrong sold 79% of his quota in FY 2009 but only 33% in FY 2010. Ryan put Armstrong on a performance improvement plan on April 25, 2010 and terminated his employment on September 30, 2010 (five months later) for continued poor performance. By comparison, Welsh was given ten months on a performance improvement plan prior to his termination.

Welsh notes that an accounting anomaly resulted in him beginning FY 2011 at a deficit. Specifically, during FY 2010, Welsh received a commitment from E. W. Scripps to purchase an ADP product. ADP credited approximately $119,000 to Welsh's sales quota for the presumptive Scripps sale.[8] However, in February or March of 2010, ADP learned that Scripps did not intend to purchase the product, a "no start," in ADP parlance. Under ADP policy, when the accounting

---

[7] Duwe ceased being an employee of ADP's NAS Division reporting to Kevin Ryan in February 2011.

[8] In his opposition memorandum, Welsh claims that he was credited approximately $150,000 for the Scripps sale. However, Plaintiff's counsel stated during Ryan's deposition that Welsh actually received a credit of approximately $119,000. Ryan Dep. 129, Doc. 15 at Page ID 212.

department determines that a sale is a no start, it comes off the books the following month. Tuccori Dep. 52, Doc. 20-8 at Page ID 616.[9]  However, ADP did not remove the Scripps no start from Welsh's sales numbers in March or April of 2010 but from his sales numbers in July 2010 — the first month of FY 2011.  This resulted in Welsh beginning FY 2011 at a deficit.

The decision to deduct the sale in FY 2011 was not made by Ryan alone but "was made by multiple people . . . to bring that [loss] into [FY 2011] so it didn't affect their numbers that year [FY 2010]."  Welsh Dep. 38–39, Doc. 14 at Page ID 78.  The deduction negatively affected FY 2011 numbers for Kevin Ryan and Mike Tuccori as well because their quotas were cumulative of the quotas of the DSMs reporting to them.  Even if the deduction had occurred in FY 2010 rather than FY 2011, Welsh would have failed to meet his quota during FY 2011 for the period in which he was working for ADP.[10]

### B.        Campanelli Does Not Hire Welsh

Following his termination, Welsh retained legal counsel to represent him in an employment lawsuit against ADP.  Welsh's attorney notified ADP of the imminent litigation by letter dated May 4, 2011 addressed to H.R. Director Jill Banister.  The letter states, in part, "[p]lease be advised that my law firm has been retained to represent Christopher Welsh in connection with various legal claims he intends to bring against [ADP] relative to his recent termination."  Doc. 20-3 at Page ID 503.  The letter does not specify that Welsh plans to sue ADP on the grounds of disability discrimination.

---

[9]  Mike Tuccori is ADP's division vice president of sales for the Midwest and was Ryan's supervisor during the final years of Welsh's employment.

[10]  An increase of $119,000 in sales for Welsh in FY 2011 results in Welsh attaining 73% of quota, rather than 60% of quota, through March of FY 2011.

Also in May 2011, Keith Campanelli, a vice president of sales for ADP's Small Business Services ("SBS") Division, began looking for a person to fill a sales executive position reporting to him in SBS. ADP's SBS Division sells and provides payroll and human resource outsourcing solutions to companies with one to fifty employees.

An ADP employee gave Welsh's resume to Campanelli to review as a potential candidate for the position. Campanelli met with Welsh on June 2, 2011 to discuss the job. Campanelli previously had made up his mind that he wanted one of his subordinates in SBS, Josh Fow, to have the job. Campanelli Dep. 30, Doc. 16 at Page ID 278. However, he decided to interview Welsh because he had been given Welsh's resume by a colleague and was open to having his mind changed. *Id*. at 37, Page ID 279. At the conclusion of the interview, Campanelli was convinced that Welsh was not a good fit for the sales executive role and that Fow was still the best candidate for the position. *Id*. 43, 64, Page ID 281, 286. Unlike Welsh, Fow had worked with Campanelli, had experience working in Small Business Services, had successfully mentored other Small Business Services representatives, and was familiar with the SBS strategy. *Id*. 70–71, Page ID 288. On July 18, 2011, Welsh was advised that ADP was "leaning toward an internal candidate." Doc. 2 ¶ 30 at Page ID 18.

On August 4, 2011, Ryan authored an email to Banister in which he stated that he wanted to make sure Welsh would not be extended an offer of employment without either Banister or the legal department having a say. Doc. 20-3 at Page ID 501. On August 18, 2011, Welsh filed a complaint in the Hamilton County Court of Common Pleas seeking damages under the Ohio Revised Code for disability discrimination arising out of the same facts alleged in the instant case. *Id*. at Page ID 517.

9

Campanelli never spoke to Ryan, Banister, or anyone else in human resources about Welsh or his application.  Campanelli Dep. 64–65, Doc. 16 at Page ID 286.  Campanelli offered Fow the sales executive position in a letter dated September 8, 2011.  Campanelli Dep. Ex. 2, Doc. 16-1 at Page ID 305.

In September or October 2011, Campanelli had a conversation regarding an undisclosed topic with ADP's in-house counsel Yvette Gordon.  Campanelli Dep. 67-68, Doc. 16 at Page ID 287.[11]  Campanelli was unaware that Welsh allegedly had a disability at the time he decided to hire Fow instead of Welsh for the SBS sales executive position.

Other than giving him a performance review, Ryan never did anything to lead Welsh to believe that Ryan had animosity toward him because he had MS.  Welsh Dep. 53, Doc. 14 at Page ID 82.  Welsh does not argue that anyone at ADP other than Ryan said or did anything that suggested they harbored animosity toward him because of his medical condition.  *Id*. at 65, Page ID 85.  Welsh never needed nor requested an accommodation for any disability while employed at ADP, and he was able to perform the essential functions of the DSM position at ADP without an accommodation.

## II.     LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn

---

[11]  During Campanelli's deposition, counsel directed him not to answer questions about the substance of his conversation with Gordon, asserting privilege grounds.  Campanelli Dep. 67, Doc. 16 at Page ID 282.

therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III. ANALYSIS

### A. Burden Shifting

Welsh seeks to establish his discrimination and retaliation claims based on circumstantial evidence. Disability discrimination and retaliation claims based on circumstantial evidence are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (applying the burden-shifting framework to an ADA claim).

Under the burden-shifting framework of *McDonnell Douglas*, the plaintiff must first establish a prima facie case under the relevant statute. *McDonnell Douglas*, 411 U.S. at 802. "A

plaintiff's burden in establishing a prima facie case is not intended to be an onerous one."

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1114 (6th Cir. 2001). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant makes the appropriate showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-55 (1981).

Pursuant to this framework, the Court will first determine whether Welsh has stated a prima facie case of disability discrimination and/or retaliation. If he does, the Court will then determine whether Defendants have proffered a legitimate, non-discriminatory reason for their conduct. If Defendants satisfy this criteria, the Court will inquire as to whether a reasonable finder of fact could find that Welsh has shown that the proffered reasons were a pretext for disability discrimination or retaliation. If Welsh has produced evidence from which a jury could conclude that Defendants' proffered reasons for their actions were a pretext for discrimination or retaliation, Defendants' motion for summary judgment must fail.

## B.    Disability Discrimination

Welsh claims that he is disabled by virtue of his multiple sclerosis and that Defendants subjected him to adverse employment actions at least in part because of this disability. The adverse employment actions Welsh complains of are criticism of his work performance, termination of his employment, and refusal to hire him for the SBS sales executive position in 2011.[12] He brings his disability discrimination claim under the ADA and Ohio law.[13]

---

[12] In his Amended Complaint, Welsh additionally claimed that ADP refused to consider him for an open position "in or about the summer of 2010." Doc. 2 at Page ID 19. The evidence

12

The Ohio and federal anti-discrimination statutes contain similar prohibitions against disability discrimination, and Ohio courts rely on interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law. *Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206–7, 82 Ohio St. 3d 569, 573 (Ohio 1998). Thus, the Court will analyze Welsh's disability discrimination claims under the ADA. The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### i. Prima Facie Case

There are five elements of a prima facie case of discrimination under the ADA: the plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) he was replaced or the position remained open while the employer looked for other applicants. *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 936 (6th Cir. 2000). The fifth element also can be assessed by analyzing whether the employer treated "similarly situated non-protected employees . . . more favorably." *Hopkins v. Elec. Data Sys.*, 196 F.3d 655, 660 (6th Cir. 1999).

---

shows that Welsh applied for an open position in January 2010 in ADP's Comprehensive Outsourcing Services ("COS") unit. As Welsh was not diagnosed with MS until March 2010, Welsh no longer contends that his failure to win the COS position was the result of discrimination. *See* Doc. 20 at Page ID 423, n.11.

[13] Welsh does not assert the ADA claim against Kevin Ryan.

13

Defendants argue that Welsh cannot satisfy the fifth element of the prima facie case of discrimination. Welsh's position at ADP was not held open and he was not replaced; his work responsibilities were divided among existing sales associates reporting to Kevin Ryan. Therefore, the only question at this stage is whether Defendants treated similarly situated, non-disabled DSMs more favorably. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). To make this comparison, Welsh must show that "he and his proposed comparators were similar in all relevant respects . . . and that he and his proposed comparators engaged in acts of comparable seriousness." *Id*. (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) and *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).

In assessing the relative seriousness of the employees' acts, a court may consider "whether the individuals 'have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Wright*, 455 F.3d at 710 (quoting *Ercegovich*, 154 F.3d at 352). There need not be an "exact correlation" between the plaintiff and the non-protected employee who was treated more favorably. *Ercegovich*, 154 F.3d at 352. Rather, the role of the court is to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id*.

For the purposes of satisfying the fifth element of the prima facie case, the Court finds that Bob Capace, Jennifer Kirkwood, and Greg Duwe were similarly situated, non-disabled DSMs who were treated more favorably than Welsh. Taking April 2008 as the starting point,

14

ADP is correct that no DSM did worse than Welsh. This fact is demonstrated by the following chart ADP created to reflect those employees' sales performance relative to Welsh's in time segments that correspond to the dates Welsh received performance memos from Ryan:[14]

| Period of Time | Chris Welsh | Bob Capace | Jennifer Kirkwood | Greg Duwe |
|---|---|---|---|---|
| Apr. 2008–Dec. 2009 (verbal warning Jan. 2010) | 20% of quota | 65% of quota | 153% of quota | 106% of quota |
| Apr. 2008–May 2010 (written warning June 2010) | 21% of quota | 55% of quota | 97% of quota | 120% of quota |
| Apr. 2008–Nov. 2010 (written warning Dec. 2010) | 27% of quota | 59% of quota | 114% of quota | 106% of quota |
| Apr. 2008–Jan. 2011 (written warning Feb. 2011) | 29% of quota | 59% of quota | 113% of quota | 96% of quota |
| Apr. 2008–Mar. 2011 (termination Apr. 2011) | 29% of quota | 68% of quota | 110% of quota | N/A[15] |

However, the evidence also shows that each of these DSMs routinely missed monthly quotas, and none of them consistently met annual quotas. *See* chart above listing sales data by fiscal year.

ADP's policy is that *each* DSM must meet sales quotas on a monthly and annual basis, yet ADP did not discipline or terminate Capace, Kirkwood, or Duwe during the periods of time when they failed to meet their monthly and annual quotas. ADP did terminate DSM Reggie

---

[14] The numbers in the chart are derived from the undisputed sales reports maintained by Ryan during Welsh's employment. *See* Doc. 17-1, Page ID 335–86.

[15] Duwe ceased being an employee of ADP's NAS Division reporting to Kevin Ryan in February 2011.

15

Armstrong for failure to meet performance expectations. However, it is unclear precisely what criteria ADP used to determine whether and when to terminate an underperforming DSM.

The only stated basis for Welsh's termination was failure to meet performance goals. Thus, this case is distinguishable from those in which plaintiffs failed to satisfy the fifth prima facie element because they engaged in conduct that was clearly different from proposed comparators. *See*, *e.g.*, *Wright*, 455 F.3d at 710 (finding that Wright could not be considered similarly situated to his proposed comparator for the purposes of discipline because they engaged in different conduct, and the differences in their conduct were relevant); *Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 458–459 (6th Cir. 2010) (holding that Colvin and his proposed comparator had not engaged in the same conduct because, although both had problems filling prescriptions on time, only Colvin had committed errors in filling prescriptions). In this case, all DSMs reporting to Ryan engaged in the same conduct that allegedly was the basis for terminating Ryan: poor sales performance. Accordingly, Welsh has adequately established a prima facie case of disability discrimination regarding his termination.

Conversely, Welsh has not established a prima facie case of discrimination with respect to ADP's decision not to hire him as an SBS sales executive in 2011. Welsh admits that Campanelli did not know of his alleged disability at the time he made the decision to hire Fow instead of Welsh for the position.[16]  Further, the position did not remain open while Campanelli

---

[16]  Welsh argues that the "cat's paw" theory of liability applies in this case to impute Ryan's discriminatory animus to Campanelli's decision to hire Fow rather than Welsh for the sales executive position. Cat's paw liability is defined as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).

Welsh argues that Ryan "injected himself into Welsh's job search" by writing the August 4, 2011 email to Banister expressing his concern about Welsh being rehired at ADP. In other

looked for other applicants: Campanelli hired Fow, whom the evidence shows was Campanelli's first choice for the position both before and after he interviewed Welsh.

The burden thus shifts to ADP to articulate a legitimate, non-discriminatory reason for terminating Welsh.  It need not do so with respect to its decision not to hire Welsh for the SBS position as Welsh has failed to demonstrate a prima facie case of discrimination with respect to that decision.

### ii.    Legitimate Non-discriminatory Reasons

Now that Welsh has shown a prima facie case of disability discrimination regarding his termination, "the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action."  *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).  "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment decision."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Defendants easily meet their burden.  ADP's stated reason for Welsh's termination was his unsatisfactory sales performance based on his failure to meet monthly and annual quotas.

---

words, he argues that Ryan's act of sending an email to Banister was motivated by discriminatory animus and that the act of sending the email was the proximate cause of Campanelli not hiring Welsh.  However, there is no evidence that Campanelli was aware of Ryan's email.

Welsh asks the Court to infer from the fact that Campanelli spoke to ADP's legal department about an unspecified topic at some point in September or October of 2011 that he must have learned about Ryan's August 4, 2011 email.  This requires too much of a leap to provide substance to the argument: There is no evidence that Banister spoke to the legal department regarding Ryan's email, there is no evidence that Campanelli discussed Ryan's email with legal, and Campanelli testified that he had made up his mind following his interview with Welsh on June 2, 2011 that he wanted to hire Fow for the position.

Failure to meet sales quotas can be a legitimate, nondiscriminatory reason for discharge. *See Smith v. Interim Healthcare of Cincinnati, Inc.*, No. 1:10cv582, 2011 WL 6012971, at *11 (S.D. Ohio Dec. 2, 2011); *Succarde v. Fed. Express Corp.*, 106 F. App'x 335, 339 (6th Cir. 2004); *Gregory v. Interface Flooring Sys., Inc.*, No. 93-4261, 1995 WL 538673, at *4 (6th Cir. Sept. 8, 1995). There is ample evidence in the record that Ryan repeatedly advised Welsh that all DSMs were expected to meet monthly and yearly quotas and that Welsh did not do so. Because this satisfies Defendants' burden of offering evidence of a legitimate, nondiscriminatory reason for terminating Welsh, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570.

### iii.    Pretext

The remaining question is whether Welsh has produced sufficient evidence to allow a jury to decide that, despite the plausibility of ADP's nondiscriminatory reason for terminating him, the real reason he was terminated was that ADP engaged in disability discrimination. *See, e.g., Skrjanc v. Great Lakes Power Co.*, 272 F.3d 309, 315 (6th Cir. 2001). A plaintiff may establish that the employer's given reason for the termination was a pretext for discrimination by showing that the employer's reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[ ] intentionally discriminated against him." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011)). "[A] reason cannot . . . be a pretext for

18

discrimination unless is it shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Hicks*, 509 U.S. at 515).

Welsh seeks to demonstrate pretext by way of the third factor, that is, by showing that his failure to meet his sales quota on a monthly and annual basis was insufficient to warrant his termination. A plaintiff's showing under this factor "ordinarily [ ] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds, *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). This type of rebuttal is a "direct attack[] on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide[s] an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.' As *Hicks* teaches, such a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case." *Id.* (quoting *Hicks*, 509 U.S. at 511).

Drawing all reasonable inferences in Welsh's favor, the Court finds that the evidence raises a question of fact, namely, whether Welsh's unsatisfactory sales performance was sufficient to warrant his termination. DSMs reporting to Ryan routinely missed their annual and monthly quotas. Not a single DSM met his or her quota each month for an entire fiscal year from 2007 to 2011, and Welsh was never the lowest performing DSM as measured by percentage of quota attained. Both Capace and Welsh failed to achieve their annual quotas in successive years: 2009 and 2010. However, only Welsh was put on a performance improvement plan. Both

19

Kirkwood and Welsh met their monthly quotas in only one month in 2010, and Kirkwood ended the year at -74% of quota. However, ADP did not terminate Kirkwood; it transitioned her into a different position. Welsh had higher sales than Capace and Kirkwood in terms of dollars as opposed to percentage of quota: during FY 2007 through 2011, Welsh sold $5.927 million in ADP business whereas Capace sold $5.144 million; and during FY 2007 through 2010 when they were both in the DSM role under Ryan, Welsh sold $5.424 million in ADP business and Kirkwood sold $3.765 million.

In addition to the fact that Welsh was put on a performance memo and was terminated for poor performance when other DSMs also missed performance requirements, Welsh also was the only DSM reporting to Ryan in 2010-2011 who had a no start taken off at the beginning of the new fiscal year, several months after ADP learned it had lost the business. Further, despite having a long history of missing his quotas, Welsh was not put on a performance memo until after he told Ryan that he had MS.

Welsh interprets these facts as demonstrating that ADP singled him out and that his sales performance alone was insufficient to prompt his termination. Welsh's interpretation of the evidence is plausible and, if proven, could support a jury verdict in his favor. Evidence that other, non-protected employees have commonly engaged in conduct that an employer provides as grounds for terminating a protected employee can be sufficient to support a factfinder's finding of intentional discrimination. *See, e.g.*, *Madden v. Chattanooga City Wide Service Dep't*, 549 F.3d 666, 676 (6th Cir. 2008). Additionally, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger,* 681 F.3d at 285 (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)). Thus, the facts that Welsh

received his written reprimand shortly after revealing his MS diagnosis and received performance memoranda when other DSMs also were not meeting quotas, and when Welsh was showing improvement, comprises evidence that, if viewed in a light most favorable to Welsh, could support a finding that the proffered reason for Welsh's termination was insufficient to warrant his discharge.

Welsh has met his burden of producing evidence that, if believed, could support an inference that ADP intentionally discriminated against him because of his disability. Accordingly, summary judgment in Defendants' favor on Welsh's discrimination claim arising out of his termination is improper.

### B.      Retaliation

Welsh claims that he engaged in activity protected by the ADA and Ohio law when he advised ADP that he had retained legal counsel and was going to sue ADP for claims relative to his termination.[17]  He asserts that after engaging in this protected activity, Defendants retaliated against him by denying him the open position in SBS reporting to Campanelli.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  A retaliation claim under the ADA uses the same framework as a retaliation claim under Title VII.  *Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104, 113 (6th Cir. 2009) (citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997))  A prima facie case of retaliation requires a plaintiff to demonstrate that (1) he engaged in activity protected by the ADA; (2) the defendant knew of his

---

[17]  Welsh does not assert the federal claim against Kevin Ryan.

exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Id.* (citing *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009)).

Although the burden of establishing a prima facie case in a retaliation action is not an onerous one, Welsh cannot present a prima facie case of retaliation because he cannot demonstrate a causal connection between his alleged protected activity and his failure to get the SBS position. In order to establish causation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Welsh argues that there is evidence from which a reasonable jury could conclude that Welsh's act of announcing his intention to sue ADP and his subsequent filing of a lawsuit against the company played a role in him not being awarded the SBS sales executive position. He relies on the following facts: Campanelli told Welsh during his June 2, 2011 interview that he was "more than qualified" for the position; Ryan emailed Banister on August 4, 2011 and indicated he did not think Welsh should be extended a position at ADP unless Banister or legal had a say; and Campanelli then awarded the job to Fow.

Welsh's argument is unavailing because there is no link between Campanelli and Ryan or Banister. Campanelli testified that he never spoke to Ryan, Banister, or anyone else in human resources about Welsh. While he did testify that he spoke to someone in ADP's legal department sometime in September or October 2011, there is no evidence that he discussed Welsh or his pending lawsuit against the company. Perhaps most important, though he may have

placated Welsh during the interview and afterward, Campanelli testified that he always favored Fow for the position and offered him the position in a letter dated September 8, 2011.

Absent evidence that a decisionmaker was actually aware of a plaintiff's protected activity, a plaintiff cannot establish the causal connection required in the fourth prong of a prima facie case of retaliation. *See*, *e.g.*, *Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 361 (6th Cir. 2012) ("Hiring decisionmakers cannot 'retaliate' when unaware of the supposed triggering act."). Campanelli testified that he knew on June 2, 2011 when he interviewed Welsh that Welsh was not the best candidate for the position. Although Welsh's attorney notified Banister of Welsh's intent to file a lawsuit in a letter dated May 4, 2011, there is no evidence that Campanelli was aware of this fact, and the letter itself did not reference disability discrimination. Further, Welsh did not file a lawsuit against ADP until August 2011 — after Welsh had been notified that Campanelli was leaning toward hiring an internal candidate. The evidence is insufficient to support an inference that Campanelli would have hired Welsh if Welsh had not threatened to sue and then sued ADP for disability discrimination.

Because no reasonable jury could conclude that Welsh established a prima facie case of retaliation, the Court need not proceed to the second or third step of the *McDonnel Douglas* analysis. Defendants are entitled to summary judgment on Welsh's federal and state law claims of retaliation.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 17) is GRANTED as to Plaintiff's discrimination and retaliation claims arising out of his failure to be

awarded the position in Small Business Services and DENIED as to Plaintiff's disability

discrimination claim arising out of his termination.

     IT IS SO ORDERED.


                             S/Susan J. Dlott              
                             Chief Judge Susan J. Dlott
                             United States District Court

24